EARNEST E. MILLER v. WALTER R. MILLER, ESTHER A. MILLER, JAMES THOMAS MILLER, JESSIE FRED MILLER, NELLIE A. BRITTAIN, EFFIE DENNIS, EDWARD MILLER, HARLEY OWENS, HARLEY OWENS, Guardian and Curator of the Estate of ROBERT JACK OWENS, a Minor, ROBERT JACK OWENS, Individually, JAMES MANTLO, EDNA GOLDEN, OPAL GOLDEN, FRANCES GOLDEN, RUTH MANTLO, GRACE VANDERPOOL and MARTHA GALE MANTLO, a Minor, Defendants, and WALTER R. MILLER and ESTHER A. MILLER, Appellants.—No. 39050.—184 S. W. (2d) 1011.

Division Two, February 5, 1945.

*W. S. Thompson* and *John E. Powell* for appellants.

*Rex H. Moore* and *P. M. Marr* for respondent.

ELLISON, P. J.—This is an action to partition 531 acres of land in Mercer county among the heirs of Robert Miller, who died intestate December 5, 1938. The suit was brought in July, 1942. The plaintiff-respondent, Earnest E. Miller is one of the sons and heirs of the decedent, having an undivided one-ninth interest in his land and estate. The defendants who did not appeal likewise are heirs, having undivided interests ranging from one-ninth to one-

sixty-third. The defendant-appellant Walter R. Miller is another son and heir of the deceased, and the defendant-appellant Esther A. Miller is his wife.

The land consists of three tracts, the first[1] containing 147.87 acres; the second,[2] 270 acres; and the third,[3] 113 acres. About a year before his death the deceased, then over 80 years old, conveyed the first tract by warranty deed recorded in book 88, page 385, of the land records of the county to the appellants Walter R. Miller and wife as tenants by the entirety. The first count of the petition alleges this deed was in fact a mortgage and seeks a decree so declaring and vesting title in the heirs of the decedent, subject to the aforesaid mortgage lien of the appellants and an equitable lien in favor of the defendant Jessie Fred Miller for money advanced in the sum of $1141. The second count prays an accounting of the rents and profits of said first tract during the four years from 1939 to 1942 while appellants were in possession. The third count prays partition of the three tracts between the parties according to their several interests.

The chancellor rendered a decree in favor of the plaintiff-respondent on all three counts. Appellants state in their brief that they are contesting only the part of the decree covering the first and second counts, namely the part holding the deed to appellants covering the first tract was only a mortgage, and requiring them to account for the rents and profits therefrom.

The warranty deed was dated November 23, 1937, and was made for a recited consideration of $2000. It was acknowledged December 29, 1937 and filed in the Recorder's office on January 3, 1938 at 11:45 A. M. The appellant grantees in said deed executed ▮▮▮ a deed of trust dated December 1, 1937, covering the same land, to a trustee for the Farmers State Bank of Princeton in Mercer county, securing the payment of their promissory note for $2200, due December 1, 1942. This deed of trust was acknowledged on January 3, 1938—the same date that the warranty deed was acknowledged. It was filed in the Recorder's office on that day at 11:55 A. M., ten minutes after the warranty deed had been filed.

---

[1]Described as: The northwest quarter (NW ¼) (fractional) and the northwest quarter (NW ¼) of the southwest quarter (SW ¼) (fractional) of Section 31, Township 64, Range 25, containing in all 147.87 acres more or less.

[2]Described as: The west one-half (W ½) of Section 22, except one acre out of the northwest corner thereof for a church, and further except the south forty-nine acres of the west one-half (W ½) of the southwest quarter (SW ¼) of said section, Township 64, Range 23, containing 270 acres more or less.

[3]Described as: The south one-half (S ½) of the southeast quarter (SE ¼) and all land lying west of Honey Creek in the northwest quarter (NW ¼) of the southwest quarter (SW ¼) of Section 21, Township 64, Range 23, containing 113 acres more or less.

There is little dispute about the facts attending the practically contemporaneous execution of the warranty deed and deed of trust. The 147 acre tract was clear of mortgages but heavily encumbered with drainage taxes, and the deceased father at one time had been indebted to the bank in the sum of $3300 on personal notes, backed only by his financial statement. This indebtedness was in process of reduction as the grip of the economic depression relaxed, but amounted to $3000 at the time of the events here involved. Hubert Fuller, president of the bank and also a lawyer, testified the father and the appellant Walter Miller had consulted him about obtaining funds to pay the delinquent drainage taxes, having also in view the fact that the last drainage bonds would mature in 1938, when the district could be fully liquidated and further taxation would probably end.

Mr. Fuller was averse to accepting a note secured by a five year mortgage on the tract signed by the father alone, because he was 80 years old and his expectancy did not promise that he would live to the maturity of the loan. So he suggested that all the children sign with the father, or that the land be conveyed to one of them who, in turn, could borrow the money. In his opinion the tract was worth $30 per acre or $4400, and the drainage taxes aggregated about $2200 thereby making the debt 50% of the security, which was sound on a banking basis. The bank cashier, Mr. Coon, thought the land was worth $35 per acre, or more than $5000.

The appellant Walter Miller later came to the bank alone, Mr. Fuller testified, and requested that a warranty deed be prepared, running from the father to him and his wife as tenants by the entirety. Still later he brought the father in and Mr. Fuller had the deed drawn by a typist in the bank, giving her an outline of the facts and perhaps even suggesting that a tenancy by the entirety be conveyed. About the same time, the note and deed of trust from appellants Walter Miller and wife to the bank were written. All these were executed in Mr. Fuller's office. After he signed the warranty deed, the father said, "This will fix it so we can get that loan and pay the drainage tax." Being asked on cross-examination whether the warranty deed was made to Walter Miller for the purpose of obtaining a loan, Mr. Fuller answered, "Well of course I couldn't say absolutely, all I can say is that they talked about getting a loan."

It is conceded that the bank account of the appellant Walter Miller, not the father's, was credited with the $2200 advanced on the note and deed of trust; that he paid the note in full and the deed of trust was released of record on November 24, 1942; and that on January 3, 1938, he paid the amount of $2200 in full of all delinquent taxes then due on the tract by his check drawn on the bank. This was the date on which the warranty deed and deed of trust were recorded.

Mr. Fuller further testified that after the death of the father he had several conversations with the appellant Walter Miller relative to

the latter's deeding the tract back to the heirs. The first was shortly thereafter. Appellant said "he didn't get the place and he never made a deal for it," or that "no deal had been completed." He said that on several occasions. And about a year later he and his wife or the respondent Earnest Miller came to the bank to have drafted a warranty deed from himself and wife (the two appellants) back to the other heirs, conveying to each a one-ninth interest; and also a note and deed of trust for $2200 running from all the heirs and their spouses to the bank, which were to be substituted for the ones the two appellants had executed on December 1, 1937. The new papers were dated February 23, 1939.

The new note and deed of trust were circulated among the heirs for over four months and were executed by all of them except the two appellants. Appellant Walter Miller came to the bank one day and took these papers out for examination but never returned them until he produced them at the trial—this notwithstanding he had said when they were drawn to send them around and he and his wife would sign them; and later after he had got possession of the papers he told Mr. Fuller on the street that he was going to bring them in and execute them. The respondent, Earnest Miller, corroborated the foregoing testimony ▮▮▮ as to the order for and execution of the new deed of trust by the other heirs, and its purpose. Both the deed and deed of trust were introduced in evidence.

Mr. Coon, cashier of the bank, testified that after the father had executed the original warranty deed to the appellants, he came to the bank one day to arrange for the extension of some of his personal notes, and on being asked about his real and personal assets he said his land was the same as before (in previous financial statements.)

Now passing to the testimony of the heirs, other than appellant and his wife. On December 7, 1937, two days after the father's death, most of the children and their spouses gathered at the home place. The appellant Walter Miller and the respondent Earnest Miller were agreed upon for appointment as administrators. Five of those present at the meeting testified that the situation with reference to the 147 acre tract was discussed, and that Walter Miller got up and told them: the tract did not belong to him any more than the other heirs; that it had been deeded to him to obtain the loan; and that he was going to deed it back. After that, appellant Esther Miller in the presence of her husband Walter told the respondent Earnest Miller on the street in Princeton that they wanted to deed the tract back because if there was another dry year it might ruin them. Still later Walter Miller proposed that they go ahead and fix out the papers, which they finally did do, as recited in the second and third preceding paragraphs.

But afterwards appellant Walter Miller began to make excuses. It appeared at first that he wanted to be released from the original $2200 deed of trust before he signed the new one which was to be substituted

therefor. Then in the spring of 1939 while he was renting the 147 acre tract (it appears he had lived on it before that) he complained to his sister, the defendant Nellie Brittain, that the respondent Earnest Miller (who was co-agent with him in handling the land of the estate after the administration had been closed) was charging him too much rent for the tract. He made the same complaint to the defendant Harley Owens.

Thereafter appellant Walter Miller raised the objection that his brother Jessie had advanced $1141 on the tract and said he was retaining the title to the tract until the others agreed to pay Jessie the amount due him from the father's estate. Still later he told the defendant Nellie Brittain that he was holding on to the tract to prevent the respondent Earnest Miller from getting it and selling it to Mr. Fuller, the banker. In the fall of 1939 he told the respondent Earnest Miller that their brother Tom Miller was having trouble with his wife and that Tom wanted him (appellant) to retain title to the land so Tom's share would stand in his own name. Later he told respondent Earnest Miller that he wanted to keep the title until he had collected his government corn and hog check, because he had shown himself to be the owner of the land when he applied for that allowance.

On February 22, 1941, the heirs had a meeting at the court house at Princeton and signed a paper agreeing to allow Jessie Miller the $1141 he had advanced, over and above an equal share in the father's estate. As we understand, the appellant Walter Miller was one of the signers of the paper. After it was signed the question about his deeding the tract back to the heirs came up. He said he wanted a little time and he thought he ought to have something for saving the place. When asked how much he wanted he finally answered $2000. One of the defendants, Ed Miller, asked him if he was crazy, and he got up and left the room.

In late July or early August, 1942, after this suit was brought, the defendants Mrs. Ed Miller and Harley Owens went to Moline, Illinois, to talk to appellant. Apparently at that time he had moved away from Mercer county. They asked him if he wouldn't deed the place back to the heirs and avoid more trouble and expense. He answered that if the respondent Earnest Miller had only sued him for the 147 acre tract alone, and had not included the partition of the other two tracts, he would have turned back the first tract; but since the other two tracts had been included in the suit "he didn't see it that way." Then he said "tell the kids, any one of the kids, if they are afraid of me and that I won't turn it back, I will give them my own personal note." In addition to the foregoing, the appellants, as already stated, rented the 147 acre tract for the year 1939, next following the father's death. That year appellant Walter Miller paid rent thereon to the estate of the father. Of this he used $80 cash rent to pay taxes on the tract, including $74.67 drainage taxes.

Further, the two $66 interest installments maturing that year on his $2200 note were paid out of estate funds, as were also $10 for insurance on the buildings; 75c for hauling posts; $9.87 for paper and paint; and $7.50 for hauling stock.

For the defense the only family witnesses called were the appellant Walter Miller and his brother Tom. His wife Esther Miller did not take the stand. Three witnesses outside the family testified on minor matters and the identification of tax receipts. Tom Miller stated he had a conversation with his father shortly after the latter had made the deed to the appellants, in which the father said there was so much against the 147 acre tract that it was gone; and that appellants would just as well have it as the other children. This witness admitted deeding his interest in the 383 acres of other inherited land to a third party while he was having trouble with his wife, but retaining the management thereof. He couldn't remember wanting the appellant Walter Miller similarly to hold title to his one-ninth share in the 147 acre tract during the same marital difficulties. But by an incomplete sentence he added that if Walter and the others said so—it must be true (?). Tom Miller was 60 years old and hard of hearing. He admitted there was some feeling between him and the respondent Earnest Miller and that he had a separate suit pending against him at the time.

Appellant Walter Miller said he had built a shed on the 147 acre tract, and it was conceded he had paid the taxes on the land after 1939 —that is for 1940, 1941 and 1942. He also paid five $66 installments of interest on the original $2200 note and deed of trust during the same three years before he paid the whole note in November, 1942. As to the testimony given by other members of the family that he had stated he would deed the 147 acre tract back to the heirs, this appellant declared he had only promised to reconvey it when two settlements had been made, one with him and one with his brother (Jessie). He denied further that he had told his sister in Princeton the land wasn't his, and maintained what he did say was that he would deed it back if they all treated each other right and settled their debts, making a complete settlement all around.

He made the further point that the 147 acre tract was not inventoried in the probate administration. The respondent Earnest Miller declared the facts had been stated to the probate judge and he advised them it need not be inventoried while the title stood as it was in the appellants' names. Appellant Walter Miller explained that some of the taxes and drainage taxes on the tract were paid out of estate money because the heirs at the time were going into a deal which contemplated that the land would be reconveyed. The estate check for $7.50 for hauling stock while he was on the 147 acre tract was accounted for on the ground that half of the stock belonged to his father, and an adjustment had been made for that out of the crop

rent. With reference to the $9.87 for paint and paper, he said that was for three houses, only one of which was on the 147 acre tract.

■ This is a sufficient statement of the facts. We will not go into the branch of the case covering the accounting of rents and profits, for appellants' basic contention is that they could not be required to account because the tract was theirs under their father's warranty deed of November 23, 1937. On that controlling issue we think the chancellor's decree for respondent is amply supported by the evidence.

Appellants start with a handicap, for it is hard to understand why the father would deed the tract to them outright for $2000 when it was worth over twice that. Their theory is that a $4400 valuation was too high in 1937, and that the other heirs began to assert claims to the land after it increased in value as the economic depression receded. But that is not a strong argument for two reasons: first, it is not in accord with the facts; and second, it cuts both ways. There is ample evidence that the appellants were willing to reconvey in 1937 and changed their minds afterwards; and that the father's deed had some connection with obtaining a loan on the land. While we have the power to make our own findings of fact, since this is an equity case, we are content with the conclusions reached by the chancellor.

■ Some of the questions asked the appellant Walter Miller and Tom Miller were objected to on the ground that they came within the ban of Sec. 1887, R. S. Mo., and Mo., R. S. A., disqualifying parties to a contract or cause of action when the other party ■ is dead or insane. But both did testify in part, and as to matter excluded no offer of proof was made that could affect the result in this case in any way.

On authority of such cases as Williamson v. Frazee, 294 Mo. 320, 242 S. W. 958, the decree below is affirmed. All concur.