**James B. REYNOLDS, Respondent,**

v.

**Elnorah M. LENGER and Frederick C. Lenger, Appellants.**

No. 49217.

Supreme Court of Missouri,

Division No. 2.

March 11, 1963.

Motion for Rehearing or for Transfer to Court En Banc Denied

April 8, 1963.

Charles D. Tudor, Jack Fleischaker, Roberts & Fleischaker, Joplin, for appellants.

Ben F. Putnam, Henry Warten, Joplin, for respondent.

BARRETT, Commissioner.

◼ The trial court has entered a decree in favor of James B. Reynolds, age 79, in this his action against his daughter, Elnorah, and her husband, Frederick C. Lenger, to have a quitclaim deed declared a mortgage, at the same time permitting him to redeem the property upon the payment of $400, together with interest from February 12, 1940. There were but two witnesses to the essential facts, Mr. Reynolds and Elnorah, and the reasonably permissible inferences from their testimony is indeed the crux of the matter. As of course the review of the appeal is anew (Sup.Ct. Rule 73.01, V.A.M.R.) but in view of the conflict in the oral testimony deference is accorded the findings and conclusions of the trial court. Miller v. Miller, 353 Mo. 884, 891, 184 S.W.2d 1011, 1014.

In April 1938 Mr. Reynolds and his wife made a down payment of $400 and purchased the property at 2202 Kentucky Avenue, Joplin, from the Home Owners' Loan Corporation for the price of $4,000. To secure the balance of the purchase price Mr. and Mrs. Reynolds executed a note for $3,600, secured by a deed of trust on the property. The note was due in fifteen years, May 10, 1953, and was payable in monthly installments of $28.46. The Reynolds family then consisted of ten members, Mr. and Mrs. Reynolds, his mother and seven of their children. Elnorah, then 21 or 22, was the eldest of the children then at home and was employed in the post office. Mr. Reynolds says that in making the down payment of $400, "We both got all together we had and made the down payment." He says that Elnorah furnished some of the money for the down payment and afterwards, from 1938 to 1940, when Mr. and Mrs. Reynolds gave her the quitclaim deed that she contributed further sums, "I figure she contributed $400 borrowed money." Neither he nor Elnorah kept a record of their dealings and he does not remember the precise sum she contributed to the down payment or how much she thereafter advanced, "Well, if she felt like it. You know how children is."

In any event, on February 12, 1940, Mr. and Mrs. Reynolds executed a quitclaim deed and conveyed the property to Elnorah for a recited consideration of "One Dollar and Other Valuable Consideration." As to the circumstances of its execution, Mr. Reynolds says, "It was just on the spur of the moment. We were just getting up from breakfast * * * She had the blank deed herself." As to the reason for executing the deed, he said, "I was just trying to make her money safe for her in case I would happen to drop off or the Mrs., why she could get her part, that was all I was trying to do. I guess I done it wrong." On direct examination he had said, "I gave it to her to guarantee her payment of this money I borrowed from her." He said she had loaned him $400 and "She wanted security for her money that I borrowed from her and I gave her that." They did not then agree on a specific sum, but "Four hundred dollars is what I borrowed from her," and "She just wanted a guarantee of what I owed her." As to when the $400 was to be repaid, there was "No certain date. * * * Whenever we got ready to sell the place she would get her portion of it." Thus the arrangement continued until 1959, when the family at home was reduced to Mr. Reynolds (Mrs. Reynolds died in 1946) and one adult son and he desired to sell the property and purchase a smaller place. In 1959 he made a trip to Elnorah's home in California and made his wishes known. "Oh, about '59 I got the thing paid for and I thought it was time then to sell and settle up." Upon returning to Joplin he wrote her a letter and sent her a quitclaim deed but "She said she had a deed to it, that's about all she said," and she refused to let him sell the property. Thereafter Mr. Reynolds would not talk to Elnorah, "In fact, I didn't know children done that-a-way."

Elnorah likewise did not keep any records and did not remember the purchase

price, but as to the down payment said, "To the best of my knowledge I paid all of it." She says that there were no family discussions as to whether her advances were a loan, but every month from then on, June 1938, to the date of her marriage, 1941, and even after moving to California, until "approximately 1943," she contributed $60 a month to her father and mother. She says that she had nothing to do with the preparation of the deed, "I only remember that my father and mother signed this paper and gave it to me because they felt I had bought the house and it was mine when they finished with it." As to her father's possession of the property throughout the years, "It was his as long as he lived and when he was gone and had no further use for it, it was to be mine—that's always been my understanding." She said that his living in the property during his "lifetime" was not discussed, "it was understood. * * * I understood it and he understood it and my mother understood it. It was bought for them." Nevertheless, she was given the deed "Because I bought it, that's why."

Mr. Reynolds' testimony as to the indebtedness and its amount is not as definite and certain as might be desired, but in the circumstances is understandable, and in view of corroborating factors is sufficient to establish the requisite debtor-creditor relationship. Stafford v. McDonnell, 359 Mo. 925, 931, 224 S.W.2d 951, 955. There is no denial that some money was advanced, the only problem is the amount and the appropriate accompanying inference. Mr. Reynolds says the advances were a loan, Elnorah emphatically claims that "I had bought the house." But in this connection even she concedes that there was a condition attached to her purchase and transfer, —"It was mine when they finished with it." He says the condition was that when the house was no longer needed as a home and it came time to sell she was to be repaid. Unlike Bobb v. Wolff, 148 Mo. 335, 49 S.W. 996, this is not the usual or common commercial transaction, this was a family affair—father and daughter. Cobb v. Day, 106 Mo. 278, 17 S.W. 323. And if the transaction was as Mr. Reynolds described it, a loan of $400, a purchase price of $4,000 and now a value of $6,000, "[I]t is hard to understand why the father would deed the tract to them (son and wife) outright for $2,000 when it was worth over twice that." Miller v. Miller, 353 Mo. 1. c. 891, 184 S.W. 2d 1. c. 1014.

But it is not necessary to dwell upon the conflicting oral testimony, to ponder credibility or characterize particular testimony, there are many indisputable, compelling factors. Mr. and Mrs. Reynolds and their family moved into the premises in 1938, children left as they married until when this suit was instituted in December 1959 only Mr. Reynolds and one son remained. The undisputed fact is that Elnorah has never been in possession of the property and has never asserted any of the rights of either ownership or possession. On the other hand, Mr. Reynolds has been in continuous possession of the property for more than twenty years and during his occupancy has exercised, without the slightest suggestion from his daughter, all the prerogatives of absolute ownership. To briefly enumerate, he has put on "new asbestos" siding, built a wall around the porch and "three sets of steps," put in two furnaces, put on two roofs and throughout the years has paid all taxes and insurance premiums. Elnorah has never paid any of these obligations or contributed to the improvements. And then for fifteen years there were the monthly payments of $28.46, all made by Mr. Reynolds. Incidentally, in 1951 Elnorah borrowed $500 from her father and repaid it shortly, she says with interest and he says without interest. In addition to his continuous possession and the improvements, in view of the relationship of the parties (father and daughter), there is the pertinent factor that Mr. Reynolds thought the transaction was a loan. Cobb v. Day, supra. Compare Holmes v. Fresh, 9 Mo. 201, a commercial transaction. And here there are no intervening rights of third parties,

as between Elnorah and her father there has been no change in position and by redemption she will be made whole for all advances found by the court but without the onus of unjust enrichment. It is not necessary to indicate the further permissible inferences or to consider and distinguish the cases, for the reasons indicated the trial court appropriately decreed the quit-claim deed to be a mortgage. In addition to the cited cases numerous illustrative cases are collected in Powell v. Huffman, 358 Mo. 138, 213 S.W.2d 473, and the annotations L.R.A.1916B, p. 18; 79 A.L.R. 937; 155 A.L.R. 1104; 90 A.L.R. 953.

In addition to her claim that the evidence is insufficient to support the finding of a mortgage, it is urged that the court erred in finding (a) that laches did not apply, and (b) that she could have foreclosed the equity of redemption when the plaintiff asserted his claim and instituted this action. This matter was not a part of the decree, it was considered, however, in the court's "memorandum opinion." The latter point is somewhat obscure but the appellant states it in this language: "the plaintiff would be barred from recovery if he delayed in bringing such action until after the defendant's right to foreclose had been barred by the statute of limitations." The various limitation statutes are cited, V.A.M.S. §§ 516.120, 516.150, 516.320, and it is said that the oral or other promises to pay were barred in either five or ten years, and the debt being barred, of course, the mortgage could not be foreclosed.

In part these arguments are answered by the inferential finding upon the essential merits of the cause, particularly by the finding as to the nature and duration of the obligation. Elnorah claims that the transaction was a purchase but even under her theory there were conditions and the transaction did not mature until "they were finished with it," or "It was his as long as he lived and when he was gone and had no further use for it, it was to be mine—that's always been my understanding." Mr. Reyn-

olds' version was that the transaction was a loan and was not to be paid until the property was no longer needed as a home and was to be sold. But as to lapse of time in general, an equitable mortgage is a device of equity and likewise the doctrine "of laches and stale demands are applicable to a suit to secure such relief." Annotation 28 A.L.R. 554; 19 Am.Jur., Equity, Secs. 490, 501, pp. 339, 346. As stated, Mr. Reynolds has remained in possession of the property from the date of purchase in 1938, he has made and paid for extensive repairs and improvements, paid all taxes and insurance premiums and for fifteen years made the mortgage payments—all these matters have their inferential bearing on laches. Niehaus v. Shetter, 78 Or. 447, 153 P. 486. It is repeating, perhaps unnecessarily, but other than the repairs and improvements by Mr. Reynolds there has been no change in either the property or the relationship of the parties. It is true that Mrs. Reynolds died in 1946, but it does not appear that she could have added to the known facts and Elnorah does not assert that her mother could have supplied additional information. Thus there has been no material loss of either record or oral testimony by reason of the lapse of time. Compare: Younger v. Evers, 333 Mo. 931, 64 S.W.2d 936; Brandt v. Manson, Mo.App., 207 S.W.2d 846, 853.

With respect to the second phase of the argument, Elnorah's reciprocal right to foreclose, "if the right of the grantee to extinguish the equity of redemption by foreclosure is barred by limitations, the right of the grantor to have the deed declared a mortgage and redeem therefrom is likewise barred" (28 A.L.R., l. c. 559), the obligation was not in fact barred. In the cases relied on, as well as those cited in the annotation, the obligations, there notes, were all barred by the applicable statutes of limitation and of course thereafter the security devices could not be foreclosed. Then, as the respondent urges, there is this inherent inconsistency in Elnorah's position; from May 10, 1938, until Mr. Reyn-

olds made the final payment on May 10, 1953, the property was encumbered with the $3,600 Home Owners' Loan Corporation mortgage and she did not so much as offer to make one of the 159 payments or inquire whether they were made. In these circumstances in this proceeding in equity the appellant's plea of laches is not compellingly impressive.

For the reasons indicated the judgment is affirmed.

BOHLING and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the Court.

All of the Judges concur.